## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

DOUGLAS SONNIER                          CASE NO.  2:20-CV-00002

VERSUS                                   JUDGE JAMES D. CAIN, JR.

RECON MANAGEMENT SERVICES INC    MAGISTRATE JUDGE KAY

### MEMORANDUM RULING

Before the Court is a "Recon Management Services, Inc.'s Motion for Summary Judgment Against Douglas Sonnier" (Doc. 88) wherein Defendant Recon Management Services, Inc. ("ReCon") moves to dismiss all claims asserted by Plaintiff Douglas Sonnier. ReCon maintains that Mr. Sonnier is subject to multiple exemptions and was at all times properly paid under the Fair Labor Standards Act ("FLSA").

### FACTUAL STATEMENT

This suit arises under the overtime payment provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. Plaintiff Douglas Sonnier applied for and accepted an offer of employment by ReCon as an experienced Electrical and Instrumentation Design Specialist III ("I/E Design Specialist III") on March 30, 2017.[1] The I/E Design Specialist III position required a two-year Associate's Degree in I/E design or at least seven years of related work experience.[2]

---

[1] Defendant's exhibit B, Deposition of Douglas Sonnier, p. 197:11-17; 119:21-120:10; Defendant's exhibit B-7.
[2] Defendant's exhibit D, Steve Cating Affidavit, ¶ 34; Defendant's exhibit D-3, Design Specialist III job Description.

Mr. Sonnier was a highly compensated employee.[3] ReCon generally designates its highly skilled designers and engineers as either "inhouse" or "in-plant." Those designated in-plant are ReCon employees but report directly to an office within the facilities of ReCon's clients, not to Recon's offices.  The in-plant employees are generally under the direct supervision of the ReCon client. The ReCon in-plant employees are independent contractors, vis a vis ReCon's clients, but spend the whole workday at the client's facilities. Whether an in-plant employee is classified as exempt and paid a salary or non-exempt and paid hourly, including time and a half for overtime, is generally determined by the relevant contract between ReCon and the client.

ReCon's in-plant designers and engineers work almost exclusively in Recon's offices, and on multiple projects for multiple clients.  ReCon's in-plant designers generally are classified as exempt and paid a salary and work directly with other ReCon designers and engineers on projects.

In ReCon's Offer Letter to Mr. Sonnier, he was to be paid an "equivalent to $135,200 on an annual basis."[4] ReCon computed Mr. Sonnier's yearly salary on an hourly basis at $65 per hour X 40 hours per week X 52 weeks.[5]

When hired, Mr. Sonnier acknowledged receipt of the ReCon Employee Handbook,[6] which categorizes his job title as Level 1 – Professional Exempt, and provides

---

[3] Defendant's exhibit A, Affidavit of Scott Scofield, Defendant's exhibit A-1, Answer to Request for Admission #3. Mr. Sonnier disputes that he was a highly compensated employee.
[4] Defendant's exhibit B-7.
[5] Defendant's exhibit B, pp. 119:21-120:10; Defendant's exhibit B-7.
[6] Defendant's exhibit B, p. 122:11-19.

that an employee's classification can change from exempt to non-exempt, and vice-versa, throughout employment.[7]

During his tenure at ReCon, Mr. Sonnier took 50 days off for either personal days or for sick leave under the Family Medical Leave Act ("FMLA"). On April 30, 2018, Mr. Sonnier's salary was increased by $1.50 per hour.[8] For those instances that Mr. Sonnier was compensated for less than 80 hours per week, he was absent for at least one full day or took time off on FMLA grounds.[9] Mr. Sonnier was paid his regular rate of pay for hours worked over 80 hours per bi-weekly pay period.[10]

Mr. Sonnier designed complex blueprints for ReCon's petrochemical clients,[11] which entailed complex electrical and instrument designs ("E&IDs") needed to build, design, or update sections of ReCon's client's plants.[12] Mr. Sonnier used his education, knowledge, and creativity to create his E&IDs.[13] Mr. Sonnier's E&IDs address multiple factors regulated by American Nations Standards Institute ("ANSI"), Occupational Safety and Health Administration ("OSHA"), Institute of Electrical and Electronics Engineers ("IEEE") and the clients' needs.[14]

---

[7] Id., pp. 122:17-123:4, Defendant's exhibit B-8, p. 297.
[8] Defendant's exhibit D, ¶ 34, Cating Affidavit, Defendant's exhibit, D-5..
[9] Defendant's exhibit B, pp. 175:11-183:9, Sonnier Deposition; Defendant's exhibit B-16; Defendant's exhibit D, ¶ 43, Cating Affidavit. The Court is cognizant that Mr. Sonnier disputes that he was paid a salary during his tenure with ReCon.

[10] Defendant's exhibit D, ¶ 14, Cating Affidavit.
[11] Defendant's exhibit C, ¶ 16, Mark Pilley Affidavit.
[12] Id., ¶ 18.
[13] Id. ¶ 20.
[14] Id. ¶ 17.

Mr. Sonnier designed electrical systems to incorporate different voltages to instruments and electrical system devices.[15] Mr. Sonnier designed connections to other electrical system devices such as transformers,[16] multiple connections to large switchgears, fuses and switches that function to protect controls and isolate electrical equipment.[17] Mr. Sonnier, along with his team of ReCon Designers and Drafters, had the primary duty of designing and configuring electrical systems that safely integrate and run instruments into new or existing sections of petrochemical plants reflected on E&IDs.[18]

Industrial contractors engage construction engineers, electricians, and others to follow Mr. Sonnier's E&IDs to build, repair, or update sections within petrochemical plants.[19] Mr. Sonnier's designs had to comply with federal and state safety standards, in addition to increasing production, and being reliable and stable.[20]

In creating his E&IDs, Mr. Sonnier considered and decided the size of equipment, materials, routing of wires, and support structure placement.[21] In addition, Mr. Sonnier oversaw and reviewed lower-level Designers and Drafters.[22] Mr. Sonnier made decisions such as the type of instrument and materials [23] to construct the E&IDs.[24] Mr. Sonnier

---

[15] Id. ¶ 22.
[16] Id. ¶ 24.
[17] Id.
[18] Id. ¶ ¶ 17 and 20.
[19] Id. ¶ 18.
[20] Id. ¶ 20.
[21] Id. ¶ 25.
[22] Id. ¶ 21.
[23] Id. ¶ 27.
[24] Id.

created the Bill of Materials necessary for ReCon to procure electrical components and instruments contained in his E&IDs.[25]

Mr. Sonnier's job duties included project management and specifying materials for procurement[26] which he performed mostly behind his desk in his office at ReCon.[27] Mr. Sonnier's work is highly intellectual and specialized,[28] which included independently creating design packages used in the construction of complex industrial projects,[29] developing complete 3-D drawings or blueprints using automated computer programs such as AutoCAD,[30] all of which required Mr. Sonnier to rely upon his years of experience and education to visualize his design.[31]

Mr. Sonnier failed to produce any documentation evidencing that he complained to ReCon regarding the reporting and calculation of overtime.[32]

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

---

[25] Defendant's exhibit A, Scofield Affidavit, Defendant's exhibit A-1, Answers to Request for Admissions 21.
[26] Defendant's exhibit A, Scofield Affidavit, Defendant's exhibit A-1, Answers to Request for Admissions 11.
[27] Defendant's exhibit B, Sonnier deposition, p. 154:11.
[28] Id., p 97:11-19.
[29] Defendant's exhibit A, Scofield Affidavit; Defendant's exhibit A-1, Answers to Request for Admissions 8.
[30] Defendant's exhibit B, Sonnier Deposition, pp. 41:23-42:18.
[31] Id., p. 62:2-5.
[32] Defendant's exhibit A, Scofield Affidavit, Defendant's exhibit A-2, Sonnier Supplemental Response to Discovery.

The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## <u>LAW AND ANALYSIS</u>

The FLSA generally provides that employers must pay their employees one and a half times their regular rate of pay for all hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1).   Section 216(b) provides employees who are improperly denied

overtime wages a cause of action to recoup unpaid wages, liquidated damages, and attorney's fees from their employers. But employers do not have to pay time-and-a-half to individuals "employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1).

The FLSA exempts highly compensated employees who are paid an annual salary exceeding $100,000[33] and customarily and regularly perform any one or more of the exempt duties or responsibilities listed in the executive, administrative, or learned professional exemptions. 29 C.F.R. § 541.601. "[A] high level of compensation is a strong indicator of an employees' exempt status" such that the performance of any one of the exempt duties of the executive, administrative or professional exemptions combined with the high level of compensation will make the employee exempt, and the need for a detailed analysis of the employee's job duties is eliminated. 29 C.F.R. § 541.601(c).

The FLSA itself does not define what it means for an employee to fall within one of these "white-collar" exemptions. Instead, it delegates authority to the Secretary of Labor to promulgate rules that define these exemptions. *Id.* The white-collar exemptions constitute affirmative defenses to overtime pay claims. The employer bears the burden of proving that a plaintiff is properly classified as an exempt employee. See *Corning Glass Works, v. Brennan,* 417 U.S. 188, 196-97, 94 S.Ct. 2223 (1974); *Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 206, 86 S.Ct. 737 (1966); *Dalheim v. KDFW-TV,* 918 F.2d

---

[33] As of January 1, 2020, the total annual compensation is $107,432.

1220, 1224 (5th Cir. 1990); *Kastor v. Sam's Wholesale Club,* 131 F.Supp.2d 862, 865 (N.D.Tex. 2001).

ReCon moves to dismiss Mr. Sonnier's claims because he is ineligible for FLSA mandated overtime due to the "white-collar" exemption under the defined executive, administrative, and professional categories. See 29 U.S.C. § 213(a)(1). ReCon argues that Mr. Sonnier satisfies the relaxed test for exemptions for highly compensated employees. *Smith v Ochsner Health Sys.,* 956 F.3d 681, 685 (5th Cir. 2020).

Mr. Sonnier argues that he was not paid on a salary bases and the even if the Court finds that he was paid on a salary bases, ReCon subjects Sonnier to improper deductions. Mr. Sonnier further argues that there is a genuine issue of material fact as to whether or not ReCon (1) willfully violated the FLSA and (2) did not act in good faith.

*Guaranteed minimum weekly amount*

First, ReCon must prove that Mr. Sonnier was paid on a salary basis. See 29 C.F.R. §§ 541.200(a)(1), 541.300(a)(1) and 541.601(b)(1). Mr. Sonnier argues that he was not paid on a salary basis, thus ReCon fails the first requirement of an exempt employee. Mr. Sonnier relies on the following:

- ReCon's employee information sheet for Mr. Sonnier which reflects his rate or pay at $65 per hour;[34]
- ReCon's pay increase dated May 1, 2017 which reflects that Mr. Sonnier's rate of pay at $65 per hour;[35]
- ReCon's pay increase dated April 30, 2018 which reflects that Mr. Sonnier rate of pay increased to $66.50 per hour;[36]

---

[34] Plaintiff's exhibit A.
[35] Plaintiff's exhibit B.
[36] Plaintiff's exhibit C.

- Mr. Sonnier's Separation Notice dated November 27, 2018, which reflects a rate of $66.50 per hour;[37]
- ReCon's "Billing Information" which reflects that MR. Sonnier, an "EXEMPT" employee is billed at a rate of $65 per hour;[38]
- A Standard Claim Form for "Short-Term Disability Benefits" which notes that Mr. Sonnier is paid "Hourly";[39]
- A Notice of Unemployment Claim Filed which reflects that Mr. Sonnier's "Hourly Rate of Pay" is "$66.50"; The Form does not provide an option for salary.[40]
- The fact that Mr. Sonnier was required to track his "Time by Day by Job Type";[41]
- Sonnier's pay stubs.[42]

Title 29 C.F.R. § 541.602 provides, in pertinent part, the following:

(a) General rule.  An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent bases, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

   (1) Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked.  Exempt employees need not be paid for any workweek in which they perform no work.

                                        * * *

(b) Exceptions. The prohibition against deductions from pay in the salary basis requirement is subject to the following exceptions:

   (1) Deductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability. . . .
   (2) Deductions from pay may be made for absences of one or more full days occasioned by sickness or disability (including work-

---

[37] Plaintiff's exhibit D.
[38] Plaintiff's exhibit E.
[39] Plaintiff's exhibit F.
[40] Plaintiff's exhibit G.
[41] Plaintiff's exhibit H.
[42] Plaintiff's exhibit I.

related accidents) if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability. Deductions for such full-day absences also may be made before the employee has qualified under the plan, policy or practice, and after the employee has exhausted the leave allowance thereunder. . . .

(7) An employer is not required to pay the full salary for weeks in which an exempt employee takes unpaid leave under the Family and Medical Leave Act. Rather, when an exempt employee takes unpaid leave under the Family and Medical Leave Act, an employer may pay proportionate part of the full salary for time actually worked. . . .

(b) When calculating the amount of a deduction from pay allowed under paragraph (b) of this section, the employer may use the hourly or daily equivalent of the employee's full weekly salary or any other amount proportional to the time actually missed by the employee. . . .

Also relevant to this Court's inquiry is Title 29 C.F.R. § 641.604 which provides, in

relevant part, the following:

(a) An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis. . . .

(b) An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned. The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek. . . .

Mr. Sonnier maintains that ReCon cannot prove that he was guaranteed a minimum

weekly amount and suggests that ReCon has submitted no documents which indicate that

Mr. Sonnier was guaranteed a minimum weekly amount. The Court disagrees.  ReCon has

submitted the Affidavit of Mr. Cating, the Controller for ReCon, who attests that exempt "In-house" employees such as Mr. Sonnier are regularly paid a predetermined salary that is guaranteed by their employment contract, ReCon's Employee Hand book, long-standing ReCon procedures, and the FLSA and FMLA.[43] In addition, the Offer of Employment dated Mary 23, 2017, states that the "salary for the position will be paid on a bi-weekly rate of $5,500[44] which is equivalent to $135,200 on an annual bases." [45]

*Reasonable relationship test*

Next, Mr. Sonnier maintains that ReCon's Compensation Plan violated the reasonable relationship test because it resulted in pay that was significantly higher than an employee's base salary based on the number of hours worked in any one week. In other words, 29 C.F.R. § 541.604 allows ReCon to pay Mr. Sonnier more than his guaranteed salary provided that there is a reasonable relationship between the guaranteed amount and the additional sums actually earned.

For instance, in order for a weekly salary to have a "reasonable relationship" under the regulations, the Department of Labor ("DOL") compares the exempt employee's actual earnings to his/her guaranteed weekly salary.  Mr. Sonnier notes that the DOL has found that a "1.5-to-1 ration of actual earnings to guaranteed weekly salary is a "reasonable relationship." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, Fair Labor Standard Act, 2018 WL 5921453,  at *2 (Nov. 8, 2018) (citing 29 C.F.R. § 541.604(b)); *Brown Aleris Specification Alloys, Inc.,* 2016 WL 1183207,  at *2, *4 (N.D. Ind. Mar. 28,

---

[43] Defendant's exhibit D Steve Cating Affidavit, ¶ 18 and Exhibit 2 attached thereto.
[44] There was a clerical error; the salary is actually $5,200 bi-weekly.
[45] Defendant's exhibit B-7.

2016) (employee's actual earnings did not exceed approximately 1.4 times the guaranteed salary); *Hass v Behr Dayton Thermal Prods., LLC,* 2008 WL 11351383, at *13 (S.D. Ohio Dec. 22, 2008) (actual earnings were approximately 1.32-times the guaranteed salary)); see also Dep't of Labor, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22184 (Apr. 23, 2004) ("If a nurse whose actual compensation is determined on a shift or hourly basis usually earns $1,200 per week, the amount guaranteed must be roughly equivalent to $1,200.").

However, as noted by ReCon, the DOL did not state that a 1.5 ratio was the absolute maximum permissible ratio to satisfy the "reasonable relationship" test. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, Fair Labor Standards Act, 2018 WL 5921453, at *2 (Nov. 8, 2018). But see, "[U]sual earnings that are nearly 1.8 times—close to double—the guaranteed weekly salary materially exceed[s] the permissible ratios found in the regulations and are not roughly equivalent to th[e] salary under § 541.604(b)." Id.

Mr. Sonnier argues that even if his own payroll record does not illustrate a "reasonable relationship" violation, the Court should consider the payroll records of former opt-in plaintiffs to show that ReCon's pay policy did not comply with the "reasonable relationship" test. Citing *Fetrow-Fix v Harrah's Entm't Inc.,* 2011 WL 5827199, at *3 (D.Nev. Nov. 18, 2011); *Ergo v. Int'l Merch. Servs., Inc.,* 519 F.Supp.2d 765, 770 (N.D. Ill. 2007). In other words, Mr. Sonnier suggests that the Court should consider an employer's payroll practices (which would include the former opt-in plaintiffs) when

determining if ReCon satisfied the "reasonable relationship" test with regard to Mr. Sonnier's wages.

Title 29 C.F.R. § 541.603(a) provides that "[a]n actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis." Thus, when considering improper deductions, evidence of an employer's "actual practice" for employees in the same job classification working for the same managers responsible for the actual improper deductions" (otherwise known as an aggregate proof analysis) is permissible. § 541.603(b). However, as noted by ReCon § 604 contains no language that would require a court to look at anything other than the earnings of a specific employee. Specifically, § 641.604(b) states that

> "[t]he reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings as the assigned hourly, daily or shift rate for the employee's normal scheduled workweek. . . . The reasonable relationship applies only if the employee's pay is computed on an hourly, daily or shift basis. . . ."

The Court finds that Mr. Sonnier's exhibits J and K[46] are irrelevant as to whether or not ReCon's salary payments to Mr. Sonnier met the reasonable relationship test.

ReCon further notes that even if this Court were to consider the former opt-in plaintiffs, not only does Mr. Sonner misrepresent to the Court the hours worked by these employees and their respective "ratios," these former opt-in plaintiffs are not similarly situated to Mr. Sonnier because they have different managers, employment experiences,

---

[46] Exhibits J and K are payroll records of the former opt-in plaintiffs.

and job duties. Furthermore, Mr. Sonnier uses PTO[47] and Holiday pay[48] to inflate the purported hours actually worked by dissimilar former opt-in plaintiffs to inflate the "ratios."

For instance, Mr. Sonnier represents that Michael Abshire actually worked 123.5 hours in a pay period, suggesting a 1.54 ratio.[49] The 123.5 hours included 16 hours of Holiday pay, so the correct ratio is actually 1:34.1.[50] On another pay record, Mr. Sonnier suggests that Mr. Abshire had a work ratio of 1.66.1; his pay records indicate that he only worked 108.5 hours for a ratio of 1.36.1 because Mr. Sonnier used 24 hours of Holiday pay to inflate the ratio.[51] ReCon asserts that Mr. Sonnier repeats these misrepresentations with other dismissed opt-in plaintiffs such as Scott Sandifer's payroll records which has PTO factored into his total compensation to improperly inflate the ratios.

The Court find that even though it would be inappropriate to consider the former opt-in plaintiffs payroll records, ReCon's payments to Mr. Sonnier easily satisfy the "reasonable relationship" test.

*Improper deductions*

Mr. Sonnier argues that even if his pay constituted a salary, ReCon took improper deductions which demonstrates that ReCon did not intend to pay Mr. Sonnier on a salary basis. 29 C.F.R. § 541.603(a). "If the facts demonstrate that the employer has an actual

---

[47] Paid Time Off which is accumulated over time and paid to an employee for personal days off at the same hourly rate used to compute the employee's salary. ReCon can withdraw an employee's PTO to meet the guaranteed minimum and/or employees may use the PTO at any time and for any reason. Defendant's exhibit D, ¶ 21, 28, 30.
[48] Holiday pay is paid even though the employee did not work.
[49] 123.5/80.= 1.54375.
[50] 123.5 – 16.0=107.5; 107.5/80=1.34375.
[51] 132.5-24.0=108.5/80=1.35625.

practice of making improper deductions, the exemption is lost during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions." 29 C.F.R. § 541.603(b). Mr. Sonnies argues that there is a fact question as to whether ReCon's deductions were improper.

ReCon asserts that the deductions to Mr. Sonnier's pay were proper because they were for full days off that Mr. Sonnier took for either personal reasons and/or covered under the FMLA. In other words, for every bi-weekly pay period in which Mr. Sonnier was paid less than 80 hours, he was absent for at least one full day or took time off on FMLA grounds and/or was paid holiday pay which ReCon was not obligated to pay under the FLSA.

Mr. Sonnier argues that this could not be true because ReCon's argument is not supported by the math.  Mr. Sonnier bases his argument on Mr. Sonnier's pay records which indicates that Mr. Sonnier's  hours were not deducted in multiples of 8 or 10 hours.[52] For example, for the two-week pay period from May 29, 2017 through June 11, 2017, Mr. Sonnier worked 58 hours.[53] Mr. Sonnier worked 20 hours in the first week and 38 hours the second.[54] He was paid 8 hours of holiday pay and 10 hours of PTO for another day for a total of 76 hours, instead of 80 hours.[55] The FLSA does not require ReCon to pay exempt

---

[52] Mr. Sonnier worked either a 5-day work week, 8 hours per day, or a 4-day work week, 10 hours per day.
[53] Plaintiff's exhibit L.
[54]  Id. ReCon 202-ReCon 203.
[55] Id. ReCon 356.

employees holiday pay when they do not work. *Boll v. Federal Reserve Bank of St. Louis,* 365 F.Supp. 637 (E.D. Mo. 1973).

 Mr. Sonnier insists that because he was docked 4 hours, it is mathematically impossible for ReCon to have made a proper full day deduction. The pay records reflect that Mr. Sonnier was working a 4-day workweek and 10-hour shifts.  He did not work the Memorial Day Holiday but was paid 8.0 hours. The record further shows that on June 8, 2017, Mr. Sonnier worked 8.0 hours and was paid 8.0 hours.

ReCon notes that during this pay-period, Mr. Sonnier worked 6 days. ReCon argues that the FLSA allows ReCon to use Mr. Sonnier's "leave accounts"[56] in "hourly increments" to ensure Mr. Sonnier's "salary is not reduced." See *Coates v. Dassault Falcon Jet Corp.,* 961 F.3d 1039, 1048 (8th Cir. 2020). ReCon argues that because it was not required to pay 8.0 hours for the Memorial Day holiday, it overpaid Mr. Sonnier his guaranteed salary.

Even though it appears that on June 11, 2017, Mr. Sonnier's pay was reduced by 2.0, because ReCon paid Mr. Sonnier 8.0 hours which it was not obligated to pay under the FSLA for the Memorial Day Holiday, in totality, Mr. Sonnier was actually overpaid.  The remaining 2.0 hours was due to the Memorial Day Holiday being paid at 8.0 hours when Mr. Sonnier's schedule was a 4-day, 10 hour shift.

The next pay period Mr. Sonnier complains of is from June 26, 2017, through July 9, 2017, where it appears Mr. Sonnier was docked 2.0 hours.[57] During this pay period, the

---

[56] Such as PTO.
[57] Plaintiff's exhibit H, ReCon 203.

payroll record reflects that Mr. Sonnier was working 4-day work weeks ranging from 8.0 hours to 11.0 hours per day.  He did not work the July4th holiday but was paid 8.0 hours which accounts for the 2.0 hours of which he complains.  Again, ReCon is not required to pay holiday pay, so in actuality, his compensation exceeded his guaranteed salary.

Mr. Sonnier complains of being improperly docked 6.0 hours for pay period November 13, 2017 through November 26, 2017. During this pay period, Mr. Sonnier worked 7 days.[58] His paycheck stub reflects that he was paid 16.0 hours holiday pay for the Thanksgiving holiday. He worked four 8-hours days, a 6 -hour day and two 10.0-hour days.  Again, with the 16.0 holiday pay ReCon was not required to pay since Mr. Sonnier did not work these two (2) days, Mr. Sonnier was paid in excess of his guaranteed salary.

During the pay period from January 22, 2018 through February 2, 2018, Mr. Sonnier worked 4 full days.[59] ReCon used 15.5 hours PTO to make up hours when Mr. Sonnier only worked a partial day as well as another full day of work he missed.  ReCon did not pay Mr. Sonnier for the remaining two (2) full days he did not work.[60]

During the pay period from May 28, 2018 through June 10, 2018, Mr. Sonnier worked 6 days and did not work on the Memorial Day holiday.[61] Mr. Sonnier was paid 8.0 hours holiday pay plus 3.5 hours of PTO and worked 10.0 to 12.0 hour shifts for a total of 76.0 hours. As noted previously, ReCon was not obligated under the FLSA to pay Mr. Sonnier for the Memorial Day holiday.

---

[58] Plaintiff's exhibit H, ReCon 205.
[59] Id. ReCon 206.
[60] The payroll records appear to reflect that Mr. Sonnier was working 4-day, 10 hours shifts.  He did not work three of those days and only 2.0 hours on January 29, 2018. The remaining four days, her worked 10.0 hours per day.
[61] Plaintiff's exhibit H, ReCon 207.

Mr. Sonnier's argument that because his paycheck and/or payroll records are not reduced in either 8 or 10-hour increments, ReCon made improper deductions is without merit. As noted above, Mr. Sonnier's payroll records reflect that Mr. Sonnier did not work the holidays noted above but was paid for them even though ReCon was not obligated under the FLSA to pay the holiday pay. Thus, as to each pay period of which Mr. Sonnier complains, Mr. Sonnier was paid in excess of his guaranteed salary.

Next, Mr. Sonnier maintains even if he did not personally suffer improper deductions, he still has a valid claim if the employer had an "actual practice" of making improper deductions. See 69 Fed. Reg. 22122-01 *22180 (Final Rule – 2004). Mr. Sonnier relies on the payroll records of the former opt-in plaintiffs.[62] Mr. Sonnier submits that because these former opt-in plaintiffs were docked hours not in increments of 8 and 10 hours, then improper deductions were made. Of the 16 payroll periods submitted, 9 paycheck stubs reflect hours that are not in 8 or 10 hours increments that are below the 80-hours bi-weekly period. However, the paycheck stubs do not reflect the hours per day worked, and/or not worked.  Suffice it to say, without more, these paycheck stubs do not support Mr. Sonnier's theory that ReCon had a practice of making improper deductions for the sole reason that the difference in the hours paid and the guaranteed hour-hour work week were not in 8 or 10 hour increments. As noted hereinabove concerning Mr. Sonnier's paycheck stubs and payroll records which reflect the actual hours worked, ReCon actually paid in excess of what it was obligated to pay considering the holiday pay.  Also, Mr.

---

[62] Plaintiff's exhibit K, ReCon 1664, 1793, 1796, 451, 452, 457, 458, 459, 460, 1890, 1898, 1902, 1903, 1904, 1910, and 1933.

Sonnier's payroll records which tracked the hours actually worked, revealed that he did not always work an 8 hour or 10 hour shift. On some payroll records he worked several 11 and 12 hour shifts, or a 6 hours shift.  This Court will not draw an inference that ReCon made improper deductions when an exempt employee was paid less than 80 hours in a bi-weekly period, and the deductions were not in 8 or 10 hours increments,

Next, Mr. Sonnier relies on the deposition testimony of Mr.  Roger Boyette,[63] the President and co-founder of ReCon, wherein Mr. Boyette testified that he did not know why Mr. Sonnier was not receiving an 80 hour bi-weekly paycheck for pay period January 22, 2018 to February 4, 2018,  but that he should have received an 80-hour paycheck.[64] Mr. Boyette further testified that employees that worked a partial day should be bumped up to 8 hours.[65]  It appears that Mr. Sonnier is attempting to argue that Mr. Boyette was familiar with the specific deductions that ReCon was taking concerning Mr. Sonnier. However, the deposition testimony submitted by Mr. Sonnier does not go into detail about the deductions, such as what shifts Mr. Sonnier was working (6, 8, 10, 11, 12, ect.) or the hours or days Mr. Sonnier worked or did not work, or if he took PTO or had no PTO available.

Furthermore, as noted by ReCon, Mr. Boyette further testified that Mr. Cating, a CPA for ReCon for over 20 years, was responsible for determining whether the pay practice complied with the FLSA.[66]

---

[63] Doc. 105-6.
[64] Id. pp. 45:2-62:23, 132:23-133:10.
[65] Id.
[66] Id. pp. 22:15-22.

The Court finds that ReCon has sufficiently established that it did not have a practice of taking improper deductions.  Moreover, Mr. Sonnier has failed to create a genuine issue of fact for trial as to whether or not ReCon took improper deductions.

*Willful violation of the FLSA*

In his complaint, Mr. Sonnier alleges that ReCon willfully violated the FLSA. ReCon seeks summary judgment on Mr. Sonnier's willfulness claims.   The FLSA establishes a general two-year statute of limitations, however if the cause of action arises out of a "willful" violation, the statute of limitations extends to three years. See 29 U.S.C. § 255(a).  Considering the Court's finding that ReCon has not violated the FLSA, there can be no "willful" cause of action.

Even so, the Court will address the motion to dismiss the willful violation on the merits. The standard for willfulness under the FLSA is whether "the employer either knew or showed reckless disregard for the matter or whether its conduct was prohibited by the statute." See *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988). "The willfulness standard is a formidable one because the FLSA's two-tiered statute of limitations 'makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations.'"  *Schreckenbach v. Tenaris Coiled Tubes, LLC,* 2013 WL 178126. At *11 (S.D. Tex. Jan 16, 2013) (quoting *McLaughlin*, 486 U.S. at 132). A negligent violation is not a willful violation. See *Zannikos v. Oil Inspections (U.S.A.), Inc.,*605 F.App'x 349, 360 (5th Cir. 2015) (finding that plaintiff's allegations that the employer knew of the FLSA's potential applicability, as demonstrated by its employee

handbook, failed to adequately research the statute's applicability and failed to consult with attorneys of the DOL on the matter did not suffice to demonstrate willfulness).

An unreasonable violation is not a willful violation. *Id.* ("An employer who 'act[s] without a reasonable basis for believing that it for believing that it was complying with the [FSLA]' is merely negligent.") (quoting *McLaughlin,* 486 U.S. at 134-35) (alterations in original).

ReCon maintains that there is no evidence that it "actually knew its pay structure violated the FLSA" or ignored/disregarded credible complaints about its pay practices. See *Id.* 605 F.App'x at 360, n. 6 (citing *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.,* 579 F.3d 553 n. 24 (5th Cir. 2009).

ReCon submits as summary judgment evidence Mr. Sonnier's admissions that he was not aware of any evidence that would establish ReCon willfully evaded the FLSA. [67] ReCon also submits summary judgment evidence that attests to the fact that its personnel attended numerous conferences and seminars, hosting presentations by and materials from, individuals including attorneys, CPAs, and third-party company representatives regarding compliance with federal wage laws used to ensure compliance with the FLSA.[68]

ReCon informs the Court that there is no documentation in the record to suggest that Mr. Sonnier ever complained to ReCon regarding its reporting and calculation of overtime.[69] ReCon maintains that because it did not willfully fail to comply with the FLSA,

---

[67] Defendant's exhibit B, Sonnier deposition, p. 202:13-21.
[68] Defendant's exhibit D, Cating affidavit, ¶ ¶ 11-13.
[69] Defendant's exhibit A, Scofield Affidavit Exhibit A-2, Douglas Sonnier Supplemental Responses to Requests for Production #19.

Mr. Sonnier's claim of a willful violation must be dismissed and the presumptive two-year statute of limitations provision must apply.

Mr. Sonnier relies on the deposition testimony of Scott Sandifer with regard to a conversation he allegedly had with a Department of Labor ("DOL") representative, a conversation the DOL had with Mike Lanclos, a conversation Lanclos had with Tami Tolbert and Bob Lyons (both in ReCon management in 2008), and a conversation Mr. Sandifer had with Wayne Heard and ReCon HR.[70]

ReCon objects to any and all testimony of these conversations and argues that they are hearsay and not admissible either at trial or as summary judgment evidence.  Federal Rule of Evidence 801(c).  "Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. *Martin v. John W. Stone Oil Distrib., Ind.,* 819 F.2d 547, 549 (5th Cir. 1987); Federal Rule Civil Procedure 56(c)(2). The Court agrees that these conversations are hearsay and not admissible either at trial or as summary judgment evidence. Consequently, they will not be considered.  The Court finds that Mr. Sonnier has failed to present summary judgment evidence to create a genuine issue of material fact for trial that ReCon willfully violated the FLSA, first because we find that ReCon complied with the FSLA, and also because there is no summary judgment evidence to support Mr. Sonnier's claim that ReCon willfully violated the FLSA.

---

[70] Plaintiff's exhibit n, pp. 150:14-155; 13; 151:7-9; 151:9-10; 153:4-155:13.

*Good faith*

ReCon also moves to have its good faith defense accepted by the Court in that it was properly paying its employees.  The purpose of the good faith defense is to preclude liquidated damages. 29 C.F.R. § 216(b). Section 216(b) mandates liquidated damages when a district court finds an employer liable under § 206. However, the FSLA provides the following "good faith" exception:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FSLA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

The Court has previously concluded that ReCon complied with the FLSA concerning Mr. Sonnier's wages.  Consequently, there can be no claim for liquidated damages. Even if the Court had not reached this conclusion, Mr. Sonnier again relies on conversations Mr. Sandifer had with a DOL representative and others, and conversations others had to support his position that ReCon was in bad faith.  Again, hearsay evidence is not admissible either at trial or as summary judgment evidence.  As noted herein above, ReCon has submitted summary judgment evidence of its conduct in complying with the FLSA, however, there is no evidence that ReCon acted in bad faith. Accordingly, the Court finds that ReCon has met its burden of proving that it acted in good faith and had reasonable grounds for believing that its payments to Mr. Sonnier did not violate the FSLA.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the Motion for Summary Judgment in its entirety and dismiss with prejudice Plaintiff, Douglas Sonnier's claims against ReCon Management Services, Inc. at Plaintiff's cost.

**THUS DONE AND SIGNED** in Chambers on this 14th day of January, 2022.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**